W. Guy HUDSON and Grandview Osteopathic Hospital, Plaintiffs in Error,

v.

Zona BLANCHARD, Defendant in Error.

No. 36820.

Supreme Court of Oklahoma.

Jan. 10, 1956.

Rehearing Denied March 6, 1956.

George W. Miller, Ponca City, Bruce B. Potter, Blackwell, for plaintiffs in error.

Joseph P. Davies, Ponca City, for defendant in error.

CORN, Justice.

Plaintiff had been employed as a night nurse (in the defendant hospital) by the defendant, Dr. W. Guy Hudson, who, at all times mentioned herein, was the Chief Surgeon, manager and director of the defendant hospital. She brought this action to recover damages for personal injuries allegedly sustained as a result of having been thrown violently against a door frame by a patient in the hospital, while attempting to discharge duties which defendant Hudson had ordered and directed her to perform.

The petition alleged that about 1 A.M. the morning of August 16, 1951, this patient was drunk and creating a disturbance. Plaintiff telephoned Dr. Hudson, advised him of such conduct, and requested that he come to the hospital and quiet the patient. Her request was refused and she was ordered to handle the patient. Being unable to accomplish this she again telephoned defendant for assistance, but he again refused and directed her to give the patient a sedative. While attempting to quiet the patient and return him to bed he became violent and threw her against the door frame, or corner of the wall, causing injuries to her back, neck, right shoulder and right side.

Plaintiff charged defendants with negligence in that they knew this patient was strong and at times, when intoxicated, was a violent person but nevertheless ordered her to subdue him; defendants owed a duty to provide her a safe place in which to work; that defendants breached duty by ordering her to undertake the task of subduing a violent patient, and in failing to respond when plaintiff advised Dr. Hudson this patient was creating a disturbance.

Defendants' amended answer was by general denial, and also specifically denied plaintiff had been injured in the manner and to the extent alleged, but that such injuries were the result of a bus accident some years earlier. Defendants also plead that plaintiff was an experienced nurse and

had assumed any risks or danger connected with her duties; they furnished her a safe place to work, and had no knowledge the patient would create a disturbance and thereby endanger plaintiff; that she was guilty of primary negligence in failing to give the patient medication according to defendant's (Dr. Hudson) directions; that plaintiff failed to seek assistance of other employees in handling the patient, and also failed to enlist the aid of police officers; that plaintiff's failures as mentioned likewise constituted contributory negligence.

The reply denied all new matter set forth, and specifically denied plaintiff was guilty of contributory negligence; and, further plead that plaintiff had endeavored to follow defendant's direct orders, and also that she had telephoned defendant in ample time for him to have reached the hospital and assisted in caring for this patient.

The issues so presented were tried before a jury. The evidence was in conflict upon every issue. Since the questions presented upon appeal do not require a complete narrative of the evidence, the following statement sufficiently discloses the factual situation which provided the basis for this appeal.

Plaintiff, although not a registered nurse, had several years experience in other hospitals, had been employed by defendant and had charge of the hospital from 11 P.M. until 7 A.M. each night. The night of August 15th this patient (an Indian alcoholic named Carl Ponca), who was sufficiently recovered to go about the hospital, telephoned his home in a nearby town. For some reason he became upset, was threatening to leave the hospital, and his conduct was such as to cause considerable disturbance. Plaintiff testified the patient was unsteady on his feet, and smelled of whiskey. She called Dr. Hudson and told him the situation, and was advised to give the patient an aspirin and put him to bed. At that time the patient displayed physical violence to the extent plaintiff was unable to handle him. She again telephoned defendant, who inquired whether she was able to handle her job, and she told him she

could not handle the patient, but again was told to put him to bed. Following this call she was with the patient in his room when he seized her right arm and threw her so that her shoulder and neck struck the corner or door frame. Dr. Hudson came to the hospital following another (third) call, gave the patient a sedative to quiet him, and then rubbed plaintiff's neck and shoulder. When plaintiff went off duty about 8 A.M. she went home and stayed until friends took her back to the hospital. Upon arrival there defendant was called to examine her, and at that time taped her back and arm. She remained in the hospital six days, where she was kept bandaged and in bed and, after being released, returned for further treatments over the ensuing six weeks, and was unable to work for 14 months thereafter. Plaintiff later married and did not attempt to work.

On cross-examination plaintiff testified another nurse was on duty at the time of the event, but plaintiff did not call her for assistance; several years prior to this she received a head injury in a car wreck but suffered no injury to her neck or back; she telephoned defendant twice, but did not recall whether another party called him; it was approximately 45 minutes from the time of her first call until defendant arrived at the hospital; the hospital chart reflected defendant was called at 1 A.M. and was in the patient's room at 1:30 A.M., and that patient was given two shots (sedatives) at 1:30 and at 2:05, and that she signed the chart when she left duty without making mention of any altercation. The chart bore the notation made about 12:30 A.M. "still in hall, can't get to bed." Plaintiff testified she wrote "raving in hall" but the exhibit disclosed the word "raving" had been struck out.

One witness testified plaintiff was in bed at home when she saw her, and witness thought she bore black and blue marks on her arm. This witness and two other ladies took plaintiff to the hospital where she was put to bed. While in the hospital plaintiff was taped up, and after discharge from the hospital she wore bandages.

Plaintiff was unable to do any work at home and witness assisted in caring for her, and took care of household matters.

Except for the evidence specifically mentioned hereafter, it is sufficient to state that plaintiff's evidence was controverted in practically every detail upon which her action was based. Defendants' evidence was directed toward showing that plaintiff made no mention of any altercation resulting in her being injured, made no call upon others for assistance, and that others in the hospital neither heard of nor had knowledge of any events testified to by plaintiff. There was evidence tending to disclose plaintiff's injuries resulted from an accident several years prior to this occasion. And there also was testimony from which the jury could have concluded that plaintiff's injuries could have resulted from playful scuffling with other individuals while in her own home.

A medical doctor, who examined plaintiff approximately one year following this incident, testified plaintiff gave him a history of an injury received by being struck or thrown by this patient. There was a slight limitation in her physical action, but she had only subjective symptoms and at that time showed no physical evidence of injury. This physician, by agreement of the parties, was selected by the trial judge to examine plaintiff. Based upon such examination, he testified plaintiff had the same complaints from which she suffered when he first examined her in 1952, although her subjective symptoms were greater. Examination did reflect arthritic deterioration of the spine which was not noticeable in 1952, and her emotional stability had deteriorated. The witness stated her injuries in 1951 would tend to aggravate her emotional instability and arthritic condition.

Testifying in his own behalf defendant Hudson stated he had made x-ray pictures of the plaintiff and identified three documents offered in evidence as x-rays of the plaintiff made under his direction, on August 17, 1951. Plaintiff's objection to the introduction of the exhibits in evidence, for the reason same had been taken when the relationship of patient and physician existed and thus were privileged, was sustained. Thereafter defendant was asked whether, from observation of plaintiff, he had found any pathology of broken bones. Plaintiff's objection to such testimony again was sustained for the reason mentioned, and the jury was instructed not to consider any finding by defendant during the period when relationship of physician and patient existed. The exclusion of such evidence provides the basis for one of the propositions urged by defendants on appeal.

At the close of the testimony defendants renewed their demurrer to plaintiff's evidence by moving for an instructed verdict. The motion was overruled and the case submitted to the jury under the trial court's instructions. The jury returned a verdict in plaintiff's favor ($5000. less $500. credit to defendants) and the judgment herein appealed from was rendered upon the verdict of the jury.

■■ Defendants first contend the trial court committed reversible error in excluding evidence offered by Dr. Hudson as to plaintiff's physical condition, after plaintiff had testified concerning her injuries, and had put her body in evidence by taking the witness stand.

The applicable portion of our statute, 12 O.S.1951 § 385, subd. 6 provides:

"The following persons shall be incompetent to testify:

\*     \*     \*     \*     \*     \*

"6. A physician or surgeon concerning any communication made to him by his patient with reference to any physical or supposed physical disease, or any knowledge obtained by a personal examination of any such patient: Provided, That if a person offer himself as a witness, that is to be deemed a consent to the examination; also, if an attorney, clergyman or priest, physician or surgeon on the same subject, within the meaning of the last three subdivisions of this section."

The evidence providing the basis for defendants' contention disclosed the following matters. As a result of being thrown

against the wall by the patient, plaintiff testified concerning her injuries:

"Well, the back of my shoulders and my neck, it just felt like it cracked through my shoulder and neck, there is a hitch right in the middle of my back."

She also testified that after the accident she was at home, suffering from her injuries, and was taken to the hospital by a friend. The doctor taped her right side and arm, and also taped her back and "all along in front clear to my waist." She then testified that she was unable to do sweeping or ironing because of her right arm, which caused pain, and that she was unable to sleep on an ordinary bed, but had to sleep with a board under her mattress.

Defendants insist the statutory privilege was waived when plaintiff took the witness stand in her own behalf and put her body in evidence. To support such argument they cite and rely upon the following decisions of this court: Roeser v. Pease, 37 Okl. 222, 131 P. 534; Fulsom-Morris Coal & Mining Co. v. Mitchell, 37 Okl. 575, 132 P. 1103; City of Tulsa v. Wicker, 42 Okl. 539, 141 P. 963; American Bankers' Ins. Co. v. Hopkins, 67 Okl. 150, 169 P. 489; Lazzell v. Harvey, 174 Okl. 86, 49 P.2d 519; Terrell v. First Nat. Bank & Trust Co., 204 Okl. 24, 226 P.2d 431; Hudman v. State, 89 Okl.Cr. 160, 205 P.2d 1175.

The privilege which now applies to matters concerning the relationship between physician and patient was unknown to the common law, but has been extended solely by virtue of statutory enactment. For this reason the question has been the subject of judicial consideration in as many instances as the illnesses of humanity present. The basis, nature, extent and application of the rule is considered at length in Jones Commentaries on Evidence, (2nd Ed.) Vol. 5, Sections 2183, et seq; Jones, The Law of Evidence In Civil Cases, Vol. 3, section 759, et seq. However, being concerned herein only with the question whether plaintiff, by taking the stand and testifying to the facts of her injury waived the privilege

accorded her under the statute, no necessity exists for protracted discussion of the numerous related questions which arise by reason of the statute.

In addition to the cases relied upon by defendants, similar questions have been the subject of consideration by this court numerous times. Examination of the cases cited, supra, discloses that in every instance the claim of waiver of the statutory privilege was based upon the patient's testimony relative to "communication" with the physician relative to the particular physical ailment, or upon the patient's testimony relative to prior good health. As respects the last stated condition see particularly Roeser v. Pease, supra.

More recently than in the cases relied upon by defendants we considered this question in Massachusetts Bonding & Ins. Co. v. Jones, 185 Okl. 551, 94 P.2d 885, 888. In the body of that opinion the following statement appears:

"In construing an Arizona statute which provides that a physician cannot testify as to communications or to knowledge obtained from a personal examination 'without the consent of the patient' the U. S. Supreme Court in Arizona & New Mexico Railway Company v. Clark, 235 U.S. 669, 35 S.Ct. 210, 59 L.Ed. 415, L.R.A.1915C, 834, held in the syllabus: 'Neither the testimony of other witnesses, offered by the patient, nor his own voluntary testimony as to his physical condition at the time of his examination by a physician, nor any averments in the pleadings, amount to a waiver of his privilege, under Ariz.Rev.Stat.1901, § 2535, subd. 6, against the disclosure by the physician of any communications made by the patient with reference to any physical or supposed physical disease, or any knowledge obtained by personal examination of the patient, which, according to the proviso in that section, may be waived only in the event that the patient offers himself as a witness and voluntarily testifies with reference to the 'communications' made by him to the physician.' "

It is observed the reference to the Arizona statute discloses that such statute expressly concerns "communications" made by the patient. The Arizona Code, 1939, 23–103(6) provides:

"6. A physician or surgeon can not be examined, without the consent of his patient, as to any communication made by his patient with reference to any physical or supposed physical disease or any knowledge obtained by personal examination of such patient. If a person offer himself as a witness and voluntarily testify with reference to such communication, that is to be deemed a consent to the examination of such attorney, physician or surgeon."

Comparison of the foregoing reveals that our statute, in the proviso permitting waiver of the statutory privilege, does not again refer to "communications" as is the case in the Arizona statute, just quoted. The reported case of Arizona & New Mexico Ry. Co. v. Clark, 235 U.S. 669, 35 S.Ct. 210, 212, 59 L.Ed. 415, L.R.A.1915C, 834 discloses that basically the same arguments were presented and considered as are advanced in this appeal. In the body of the opinion is the following statement:

"Without the consent of the patient, the physician's testimony is excluded with respect to two subjects: (a), any communication made by the patient with reference to any physical or supposed physical disease, and (b), any knowledge obtained by personal examination of such patient. And this privilege is waived, according to the terms of the proviso, only in the event that the patient offers himself as a witness and voluntarily testifies 'with reference to such communications.' We would have to ignore the plain meaning of the words in order to hold, as we are asked to do, that the testimony of other witnesses offered by the patient or the testimony of the patient himself with reference to other matters than communications to the physician, or any averments contained in the pleadings, but not in the testimony, amount to a waiver of the privilege. The enactment contemplates that the physician receives in confidence what his patient tells him, and also what the physician learns by a personal examination of the patient. It contemplates that the patient may testify with reference to what was communicated by him to the physician, and in that event only it permits the physician to testify without the patient's consent.

*    *    *    *    *    *

"We cannot, therefore, without encroaching upon the domain of legislation, declare that there is no substantial ground for a distinction between the information the physician gains from verbal communications made by the patient and the far wider knowledge that he derives from his personal examination of the patient. Certainly it cannot be said that when the patient afterwards has occasion to make averments and adduce evidence respecting the nature of the ailment or injury, he thereby necessarily publishes to the world the facts as disclosed to the physician through the physical examination. *    *    *"

Consideration of our own statute in the light of the above quoted expression impels the conclusion that waiver (of the privilege accorded by statute) is not accomplished by a party taking the witness stand and testifying to the facts of an injury. Unless the waiver of privilege provided by the statute be held to go only to "communications", with the attending physician, it becomes obvious the statute is meaningless and a nullity. The reason is readily apparent. An injured party who takes the witness stand and testifies to the facts of an injury (for which compensation is sought) immediately is held to have waived the statutory privilege. This then permits the physician to testify directly, not only as to verbal communications with the patient, but also as to knowledge gained by physical examination. The statute obviously was not conceived with any such result in mind.

██ The second contention is that it was reversible error to overrule defendants'

demurrer to plaintiff's evidence, and to refuse defendants' requested instruction (No. 1) for a directed verdict. In support of such contention defendants argue: (1) lack of evidence to establish defendants' failure to furnish plaintiff a safe place in which to work; (2) failure of evidence to show defendant refused to come to the hosptial; (3) plaintiff's assumption of the ordinary risks of her employment.

Respecting subdivision 1 defendants insist the evidence was insufficient to show defendants' failure to provide a safe place to work because, although plaintiff testified the hospital should have employed a male nurse, there was a failure to meet the burden of proof required to show that custom required this in a hospital of this size, or even that plaintiff requested that a male nurse be employed. As to subdivision 2, defendants point out that not only was it untrue that defendant refused to come to the hospital, but that the record affirmatively discloses that he came and attended the patient, thus leaving for consideration only whether he came within a reasonable time. The 3rd subdivision of the argument is that an employee who continues employment without complaint assumed the risks which an ordinarily prudent person should have known or recognized.

Considered separately each subdivision of this argument might appear to have some merit. However, it is elementary that negligence can be shown by circumstantial evidence and the reasonable inferences to be drawn therefrom, and all a plaintiff is required to do is to make it appear more probable that his injuries resulted, in whole or in part, from defendant's negligence than from any other cause. City of Altus v. Martin, Okl., 268 P.2d 228. Defendants' demurrer to the evidence, and motion for instructed verdict at the close of all the evidence, which had the same effect as a motion for directed verdict, admitted all evidence favorable to plaintiff and the reasonable inferences to be drawn therefrom, while disregarding all evidence favorable to defendants. Kizziar v. Pierce, 204 Okl. 51, 226 P.2d 941. Measuring the evidence by these rules it is clear the evidence was not such that all reasonable men would have drawn the same conclusion therefrom. Under these circumstances the trial court properly overruled defendants' demurrer to the evidence, and the motion for an instructed verdict. See Fleming v. Hodgson, 199 Okl. 261, 185 P.2d 181.

The third proposition is that reversible error was committed by the exclusion of certain other evidence offered by defendants. This is based upon the trial court's exclusion of portions of the testimony of three witnesses.

In the first instance, in response to a direct question, defendant attempted to testify concerning a chronic neck condition from which plaintiff allegedly suffered prior to this occurrence, and that he had treated such condition. Objection was sustained to defendants' testimony and the jury was admonished not to consider his testimony relative to a previous head or neck injury. Exception was taken to the court's ruling but no offer of proof was made. In Taylor v. Davis, 199 Okl. 260, 185 P.2d 444, paragraph 2 of the syllabus states:

"As a general rule, the exclusion of evidence in the trial court will not be reviewed on appeal unless a proper offer of the excluded evidence is made and included in the record."

See also 4 C.J.S., Appeal and Error, § 291 (b), and cases collected in the foot notes.

The trial court sustained objections to questions by which defendants sought to show plaintiff sometimes had men visitors in her apartment, and that they would scuffle in a playful but rough manner. Defendants insist exclusion of such testimony prevented a showing that one visitor had struck plaintiff about the time of her alleged injury, and that this would have had a bearing on establishing her condition at the time. This argument is without merit. The witness from whom defendant sought to elicit such testimony stated she had heard a "fuss" in plaintiff's apartment, but remembered nothing more than the voices. And, testifying as to plaintiff and other persons hav-

ing engaged in rough play, the witness stated she had not seen the party in question strike plaintiff either playfully or in anger. By no permissible inference could such testimony have served to establish that plaintiff received her injury at some place other than the hospital.

Defendants further attempted to elicit testimony from another nurse, and from a hospital visitor, concerning the diet furnished the patient who injured plaintiff, and argue exclusion of this testimony prevented defendants establishing the patient was unlikely to have had the strength to injure plaintiff. Inasmuch as defendant Hudson already had testified as to the man's general physical condition and lack of strength this evidence, if admitted, would have been cumulative at best, and no showing of prejudice resulting from exclusion of such testimony is made by defendants.

Further complaint is made that it was error to exclude evidence relative to the friendliness between plaintiff and this patient, and that he had given her a gift, and had bought meals for plaintiff. The argument is that exclusion of such testimony prevented defendants from showing that such friendly relationship would have made it unlikely the patient would have struck and injured plaintiff. The nature of the excluded testimony is such that the argument obviously is without merit.

The final contention is based upon the trial court's refusal to give the jury certain requested instructions. Heretofore we have pointed out that the trial court properly refused defendants' requested instruction for a directed verdict. The three remaining instructions dealt with the relationship of master and servant and assumption of the risks of employment by an employee. Examination of the instructions given reflects that the jury was fairly advised of the law relative to these issues upon which defendant relied by way of defense. When the instructions given adequately cover the phase of the law presented by the requested instructions there is no error in refusing requested instructions. See Atchison, T. & S. F. Ry. Co. v. Raleigh, 194 Okl. 589, 154 P.2d 62; Kizziar v. Pierce, supra.

Judgment affirmed.

JOHNSON, C. J., and HALLEY, BLACKBIRD, JACKSON and HUNT, JJ., concur.

WILLIAMS, V. C. J., and WELCH, J., dissent.